## Lear v. Commonwealth.

(Decided April 20, 1926.)

### Appeal from Fayette Circuit Court.

1. Homicide—Whether Deceased's Brother-in-Law, After Shooting, Removed Shotgun for which Deceased was Allegedly Reaching when Defendant Shot, Held for Jury.—In prosecution for murder, whether deceased's brother-in-law, after the killing, removed shotgun for which accused alleged deceased was reaching in an attempt to kill him when he shot, held a question for jury.

2. Homicide—Verdict of Manslaughter Held Supported by the Evidence.—Verdict of manslaughter held supported by evidence as against defendant's contention that evidence showed he killed deceased in self-defense as deceased was reaching for a shotgun with which to kill him.

3. Homicide—21-Year Sentence for Manslaughter Held Not Result of Passion or Prejudice.—In prosecution for murder 21-year sentence upon conviction for manslaughter held not to reflect passion or prejudice on part of jury, where defendant's own testimony failed to disclose facts under which it was necessary for him, or could have been believed by him to be necessary, to kill deceased in order to avert death or danger.

4. Criminal Law—That Verdict Fixes Maximum Punishment Allowed Under Statute is Not Evidence Alone of Passion or Prejudice.— That verdict fixes maximum punishment allowed under statute denouncing the crime of which defendant is found guilty is not evidence of passion or prejudice, and Court of Appeals will not dis-

turb as excessive a verdict within the statutory limitation upon that fact alone.

J. J. McBRAYER for appellant.

FRANK E. DAUGHERTY, Attorney General, and GARDNER K. BYERS, Assistant Attorney General for appellee.

OPINION OF THE COURT BY COMMISSIONER SANDIDGE— Affirming.

The appellant, Edgar Lear, was tried by a jury in the Fayette circuit court under an indictment which charged him with the crime of murder and by its verdict he was found guilty of manslaughter and his punishment was fixed at confinement in the state penitentiary for twenty-one years. He prosecutes this appeal from the judgment rendered on that verdict.

As his case is presented by brief filed for him, but one ground is urged for a reversal of the judgment; that is, that the verdict is not sustained by the evidence. A consideration of that question makes it necessary to briefly outline the facts proved upon the trial below.

Appellant and his victim, Joe Rials, and one Emol Blackburn, agreed with each other to become partners in the illicit manufacture and sale of whiskey, and to that end they purchased a still and equipment and the ingredients for making whiskey. About a week later they were ready to begin business and assembled the stilling outfit at the home of deceased, Joe Rials, where the mash had been in process of fermentation long enough to be ready to run. They operated the still together all night Tuesday, March 9, 1925, and Wednesday were together off and on all day at Rial's home where they were making the whiskey. The still had been set up and was being operated in a cellar under his kitchen in a space approximately 14 feet square, the ceiling being not exceeding 5 feet in height from the floor. Rials appears to have spent practically all of Wednesday in the cellar where the whiskey-making was in progress, but he does appear to have been absent from there and from his home for approximately an hour about noon. Blackburn was in and out but appears to have been away from the scene of the whiskey-making more on Wednesday than either of his partners, spending part of the day at the place where he was engaged in a legitimate business in the city of Lexington. Appellant, Lear, was in and out

that day and seems to have spent a portion of the time delivering whiskey they had made to bootleggers to whom it had been sold. In making the deliveries he used an automobile belonging to his partner, Blackburn. From approximately noon on Wednesday until the homicide occurred Mrs. Joe Rials, wife of deceased, was at her home where the illicit whiskey distilling was being done, and spent at least a portion of the time in the cellar with those engaged in its manufacture. Her brother, Henry Baker Reeves, appears to have been present a portion of the time on Wednesday afternoon where the whiskey was being made, as also does John Lakes, both of them having been in the cellar where the three partners in the whiskey business were engaged in its manufacture. Late in the afternoon appellant, in company with Henry Baker Reeves, drove about the city of Lexington in Blackburn's automobile, and at the corner of Short and Upper streets ran into a car being driven by some lady, causing a blow-out in one of the front tires on his machine. He left the machine at a garage near the scene of the accident and made his way back to the home of Joe Rials.

Rials, Blackburn and Lear all appear to have begun drinking the product of their still as soon as it began to run, and all day Wednesday up to and including the time of the homicide were very much under its influence. They were described by most of the witnesses as being drunk. Appellant testified that he left the home of Rials about noon and that deceased had left before he did; that he was away about an hour and a half, and when he returned after dinner found deceased in the cellar watching the still. He testified that at that time he observed that there was a shotgun sitting in one corner of the cellar where the still was located. He inquired of Rials why he had the gun there, and was told that he had borrowed it to go coon hunting that night. He suggested that it would not be well to keep the gun there because if revenue officers should come they would think it was there for another purpose, but that Rials responded, "I have not got it there for that purpose; I have got it there for another purpose."

He testified that after the collision in which the tire blew out and when he returned to Rials' home where they were making whiskey, he called Rials out of the cellar and told him that he had had a blow-out and asked him for $5.00 with which to buy a new tube, and that

Rials responded, "$5.00, hell; I am not going to give you no $5.00." He testified that Mrs. Rials and her brother, Reeves, came out from the cellar about that time, and that Rials said to his wife: "Don't you give that G— d— s— of a b— $5.00." He testified that after that Rials told him to come into the cellar and that he followed him in there; that it was dark at that time, the only light in the cellar being that furnished by the coal oil burner under the still. He testified that Rials went to the back corner of the cellar and reclined on a quilt on the floor with his shoulders against the back wall of the cellar, and in about two feet or two and a half feet of the corner. He went to somewhere near the center of the cellar and was standing with his back against the barrel containing the worm of the still. His testimony as to what occurred then is in these words:

"A. I asked him again for the money, I said, I have got to get the tire down here and get the car home and move this still and things, and Rials said, no, I am not going to give you any $5.00, and I said that is what you told me, and he said, no, I have not got it, and I said what did you do with the $85.00 that I gave your wife this morning, and he said she has got it and will keep it, and I said, that is no way to do, I am taking the chances on everything and it's Mr. Blackburn's car and you ought to be willing to split up, and he said, no, I am not going to give you any $5.00, and then went on with a few words and I asked him to let me have it, and he said, no, I am not going to give you any $5.00, you God damned son of a bitch, I will kill you if you don't get out of here, and made a move to the gun, and I said, Joe, don't go for that gun. Q. You saw the gun? A. Yes, sir. Q. Did you have any flashlight? A. I had a flashlight then. Q. Did you turn it on him? A. Yes, sir. Q. What did he make a move as if he was going for? A. He made a move to get the gun. Q. How close did he get to the gun? A. He was right at the gun when I shot; I asked him again the last time, I asked him not to go for the gun and he said, I will kill you, and he didn't make any stop going for the gun and I saw that the only chance that I had for my life was to shoot at the time. Q. How many times did you shoot? A. I shot twice."

He further testified that no one else was in the cellar when he did the shooting, and that it was so dark he could see deceased only by the light from the flashlight he had which he held on deceased with his left hand while he shot him.

To substantiate his testimony that he shot Rials in defense of himself, appellant proved by William Travis and his wife that deceased came to their home about noon on the day he was killed and borrowed a shotgun and undertook to borrow Travis' coon dogs, but that he declined to lend them to him. Emol Blackburn, who was in the cellar at various times that day, testified also that he observed the shotgun in the corner of the cellar that afternoon. Appellant appears to have been only 19 years of age when the homicide occurred, and by a number of witnesses established a previous good character. Deceased appears to have been about 24 years of age, and testimony tending to establish that his character for peace and good order was bad, especially when drinking, was introduced for defendant. It is vigorously insisted for appellant that these facts proved for him so overwhelmingly established his right to have shot and killed deceased at the time he did in defense of himself that this court must of necessity hold that the verdict of the jury is not sustained by but is flagrantly against the evidence.

We find, however, that for the Commonwealth Mrs. Joe Rials, Henry Baker Reeves and John Lakes, admitted by appellant to have been in the cellar when they were making whiskey most of the afternoon before the homicide and who had every opportunity to see and know what was there, all positively testified there was no shotgun in the cellar where deceased was killed. Shortly after the homicide was committed someone telephoned police headquarters and a number of officers were immediately dispatched to the scene of the killing. They made a thorough search of the cellar, and while they found the still in operation, the fire under it yet burning, and everything connected therewith undisturbed, and though they found Rials lying upon a quilt in the back corner of the cellar with his head and shoulders against the back wall and dead from a pistol ball that struck him in the center of the forehead between the eyes, they found no gun near him or in the cellar or in or about the Rials' house.

Reeves for the Commonwealth, after testifying about the trip he took with appellant in Blackburn's car,

and the collision, and his leaving appellant and returning first to the home of deceased, Rials, testified as follows as to the facts of the homicide:

"A. Lear came in about fifteen minutes to seven and called Mr. Blackburn out and talked to him and then called Joe. Q. What was the talk? A. I didn't hear what he said to Mr. Blackburn, I don't know what he said to him, but I know he asked Rials for some money and Rials told him he didn't have any money and went back under the cellar, under the house. Q. That is where your sister was? A. Yes, sir; and when I came back to the bottom of the steps I heard Lear say God damn you, give me some money, and Rials didn't say anything, and I looked under the cellar and Rials was lying down and Lear shot and I walked to the cellar door and he shot again and he turned around again when I got to the cellar door and my sister had got out by that time and he met us and told us to step back. Q. What did he say? A. He told us to step back, step back, and he came out then and went around the corner of the house. Q. Did he say anything about the shooting? A. I think my sister said, you have killed him and he said, I aimed to."

The argument is made for appellant that after the shooting and before the arrival of the police officers Reeves, the brother-in-law of deceased, and brother of Mrs. Rials, removed the shotgun for which deceased was reaching in an attempt to carry out his threat to kill appellant when appellant shot him. Whether that was true or not was a question of fact peculiarly for the jury to determine. There is quite as much evidence in the record here that there was no shot gun in the cellar when appellant killed deceased as that there was. The testimony of Blackburn and the two Travises that deceased had the shotgun that day, as it appears to us in the cold print of the record, is not altogether without features suggesting its unreliability and incredibility. It seems wholly incredible that after having spent Tuesday night in its entirety making whiskey, and after having drunk as much of this newly made whiskey as the evidence discloses he had drunk, and while as drunk from its effects as the evidence discloses he was, deceased would have concluded that on Wednesday night he would go coon

hunting and would have gone to the Travis home to borrow his gun and dogs for that purpose. A yet stranger circumstance is that after Travis declined to lend him the dogs, for lack of which he could not go coon hunting, he concluded that he would borrow the gun anyhow when the only purpose for which he wanted it was to go coon hunting. Travis testified that he lent deceased a single-barrel gun. Appellant testified that it was a single-barrel gun sitting in the corner for which deceased was reaching, and to defend himself from the danger of which he shot and killed deceased. Blackburn, however, testified that it was a double-barrel gun that he saw in the cellar that afternoon. In addition to those and other features of their testimony appearing from its reproduction in the record, calculated to discredit it in the eyes of the jury, that tribunal had the advantage which we have not of observation of the witnesses and their appearance and demeanor while testifying, most valuable as an aid in determining the truth or falsity of the testimony of witnesses. In view of these facts, how can we say that the verdict is without evidence to support it when on that question the jury concluded that the shotgun in the corner was but the fabrication of defendant and his friends to lend some semblance of verity to his version of this homicide accounted for by him as being necessary in his self-defense?

It is urged for appellant that when the facts and circumstances of this case are taken into account, in connection with the extreme youth of appellant, the court can not escape the conviction that the punishment inflicted by the jury is so severe as to reflect prejudice and passion upon its part. To this contention we can not agree. Youth though he was in years, he appears to have gone far into the field of crime. It would be hard to condense into a like period of time more of crime at the hands of one person than this record discloses appellant to have been guilty of in the twenty-four hours preceding and including his killing of Joe Rials. His victim, according to his own testimony, was reclining upon the cellar floor with merely his head and shoulders against the back cellar wall. He admits that his victim was drunk; he admits that it was so dark in the cellar that he was unable to see except from the light of a flashlight which he himself was using and which he held upon deceased with his left hand while he shot him with his pistol held in his

right hand. His own testimony falls far short of disclosing a state of facts under which it was necessary or could have been believed by him in the exercise of a reasonable judgment to be necessary to kill deceased in order to avert death or danger from himself. The mere fact that a verdict returned fixes the maximum of punishment allowed under the statute denouncing the crime of which the defendant is found guilty is not evidence of prejudice or passion, and this court will not disturb as excessive a verdict within the statutory limits upon that fact alone. Galloway, et al v. Commonwealth, 209 Ky. 501.

No other question is raised for appellant by his counsel, and our examination of the record herein does not disclose any error to the prejudice of his substantial rights committed upon his trial. Hence the judgment will be affirmed.